CRABTREE INVESTMENTS, INC. and
John H. Crabtree

v.

MERRILL LYNCH, PIERCE,
FENNER & SMITH, INC.

Civ. A. No. 80–669–B.

United States District Court,
M.D. Louisiana.

Jan. 11, 1984.

John S. White, Jr., John L. (Jay) Dard-enne, Jr., Baton Rouge, La., for plaintiffs.

Lee C. Kantrow, Baton Rouge, La., for defendant.

POLOZOLA, District Judge:

██ John H. Crabtree and Crabtree Investments, Inc. (Crabtree) have filed this suit against Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch). Plaintiffs have alleged both federal and state causes of action in their complaint. The Court has jurisdiction herein pursuant to 28 U.S.C. § 1332 and the Commodity Exchange Act, 7 U.S.C. § 1, et seq.[1]

This suit arises out of certain commodity futures accounts plaintiffs had with Merrill Lynch. Plaintiffs contend Merrill Lynch increased margin requirements on plaintiffs' accounts in violation of the contracts plaintiffs had with the defendant. Plaintiffs further contend that Merrill Lynch then wrongfully liquidated the accounts when the plaintiffs failed to meet the margin demands made by the defendant. As a result of defendant's actions, plaintiffs claim substantial damages. Merrill Lynch denies any liability to the plaintiffs. Merrill Lynch contends that it acted within its legal and contractual rights when it increased plaintiffs' margin requirements and ultimately, when it liquidated plaintiffs' accounts.

██ The plaintiffs have asserted five alternative theories of recovery: 1) civil damages under the Commodity Exchange Act, 7 U.S.C. § 1, et seq.; 2) conversion or wrongful seizure and liquidation of their accounts under Louisiana law; 3) civil damages under Louisiana's Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401, et seq.; 4) breach of fiduciary duty; and 5) breach of contract.[2]

---

**1.** The plaintiffs did not assert their claim for civil damages under the Commodity Exchange Act as recognized in *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), until after the commencement of trial. However, because pleadings in federal court are merely required to give notice to the adverse party of a claim and because this cause of action is substantially similar to others alleged by the plaintiffs, the Court will consider this claim as having been properly raised in the complaint.

**2.** The Commodity Account Agreements executed by the plaintiffs provided that New York law was to apply to the contracts. Neither party has sought to invoke any provision of New York law. Because a party seeking to rely on foreign law has the burden of proving its content, the Court will, where applicable, presume that New York and Louisiana law are not in conflict.

■ In order for the plaintiffs to prevail on a cause of action under the Commodity Exchange Act, the plaintiffs must demonstrate some level of fraud, deceit, or misrepresentation on the part of the defendant. 7 U.S.C. § 6b.[3]

A cause of action under the Louisiana Unfair Trade Practices and Consumer Protection Law is more difficult to define. La. R.S. 51:1405(A) provides:[4]

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

The definition of unfair trade practices is left up to the courts. However, because the statute closely tracks the federal unfair trade practices statute, 15 U.S.C. § 45(a)(1), the Louisiana courts look to the federal cases for guidance. No federal case interpreting 15 U.S.C. § 45(a)(1) has been cited in which an unfair trade practice was found in the absence of deceptive, unethical, or monopolistic practices. Though the federal statute does not provide for private civil remedies, the Louisiana courts have also looked to the Federal Trade Commission guidelines for determining unfair trade practices. *Moore v. Goodyear Tire & Rubber Co.*, 364 So.2d 630 (La.App. 2nd Cir. 1978), cited in *Coffey v. Peoples Mortgage*

*& Loan of Shreveport, Inc.*, 408 So.2d 1153 (La.App. 2nd Cir.1981). In *Coffey*, the Court stated:

[A] practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

408 So.2d at 1156.

■ Therefore, the Court finds that in order for the plaintiffs to recover under the Louisiana Unfair Trade Practices Act, the plaintiffs must prove some element of fraud, misrepresentation, deception, or other unethical conduct on the part of the defendant.

■ A cause of action for breach of fiduciary duty in Louisiana also requires fraud or breach of trust or proof of an action outside the limits of the fiduciary's authority. La.C.C. arts. 3003, 3010.

Because fraud or deceit or some misrepresentation or other unethical conduct must be shown in order to establish liability under each of the above three causes of action, the Court shall first review the evidence presented on this issue at the trial of the case.

Crabtree Investments has rendered investment advice for banks and small busi-

---

**3.** 7 U.S.C. § 6b provides in pertinent part:
"It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person if such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—
(A) to cheat or defraud or attempt to cheat or defraud such other person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or
(D) to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person."

**4.** L.R.S. 51:1409(A) permits a party to bring a civil action for damages for a violation of L.R.S. 51:1405(A).

nesses since 1974. John H. Crabtree owns 85 percent of the company and has an interest in a trust which owns the remainder. Merrill Lynch is an investment brokerage company which has an office in Baton Rouge.

Sometime prior to May 8, 1979, Jerome R. "Rusty" Renaudin, a sales representative in Merrill Lynch's Baton Rouge office, telephoned Crabtree to solicit his investment business. During this conversation, Crabtree indicated that he might be interested in purchasing some kind of interest rate futures contracts and asked Renaudin to give him the "ground rules—" for investing in such futures contracts.

On May 8, 1979, Renaudin wrote a letter [5] to Crabtree setting out "the basics" of trading in GNMA futures contracts through Merrill Lynch. GNMA, or "Ginnie Mae", futures contracts are agreements to make or take delivery of Government National Mortgage Association instruments at some future date. The GNMA instruments are in the principal amount of $100,000 and pay interest at a fixed rate of eight percent. Thus, fluctuations in the market interest rate lead to changes in the value of the GNMA instruments. It is the speculation on these changes which gives rise to the futures contract market.

GNMA instruments are considered commodities for futures trading purposes and are traded on various commodities exchanges. In this case, the trading was to be done on the Chicago Board of Trade (CBT). The CBT sets various minimum requirements for trading futures on its exchange as required by the Commodity Exchange Act.[6] The CBT deals only with futures commission merchants which are members of its exchange. Merrill Lynch is such a merchant and is a member of the exchange. CBT looks to the member broker for settlement of all transactions which go through the CBT clearing house.

In his letter of May 8, 1979, Renaudin suggested that Crabtree and Crabtree, Inc. apply for the "Special Minimum" initial margin [7] of $1,000 per contract. The May 9, 1979 letter clearly stated that "margins are subject to change without notice." [8]

After considering the "basics" of GNMA futures trading as set forth in Renaudin's letter, Crabtree decided to open a futures account with Merrill Lynch. Crabtree executed Commodity Account Agreements and Risk Disclosure Statements for both himself and Crabtree, Inc.[9] Neither of these agreements discuss the level of margin required, although they do discuss the risk involved in commodity futures trading and the possibility that large sums of money may have to be produced on short notice to meet margin requirements.

Crabtree was apparently given the opportunity to have his accounts handled by Merrill Lynch's local commodity account executive, J. Sanders Cocke, but chose to have Renaudin handle the accounts instead. This choice was apparently based on a personality conflict between Cocke and Crabtree during some earlier dealings in 1976. Renaudin had no commodities experience, but could and did consult with other Merrill Lynch employees in order to serve Crabtree. Cocke and Naylor Stone, the Baton Rouge office manager for Merrill Lynch, provided Renaudin with the information

---

5. Exhibit P–1.

6. 7 U.S.C. § 1, et seq.

7. A margin is merely a deposit required to protect the broker from fluctuations in the market price of futures contracts.

8. The maintenance margin is the amount of deposit required after the initial purchase of a contract when the market has moved in the direction unfavorable to the investor's position. When a customer's account equity falls below the level of the maintenance margin, a "margin call" is made to require the margin to be restored to its initial level. Maintenance margins are generally expressed as a percentage of the initial margin. The plaintiffs argue that the amount of this maintenance margin was fixed by the Renaudin letter at $750 for special minimum customers. This would, of course, be 75 percent of the initial margin of $1,000. The Court finds that after reading the letter as a whole, the maintenance margin is merely a percentage of the initial margin. That is, when the account equity falls to 75 percent of the initial margin, the initial margin must be restored.

9. See Exhibits D–2, D–3, D–5, and D–6.

which was set forth in the May 8, 1979 letter.

While the plaintiff had never dealt in GNMA futures before this initial investment, it is clear that Crabtree was not an inexperienced or unsophisticated investor. Crabtree had been an investment officer at American Bank and Trust Company in Baton Rouge for eight years. In addition, he had run his own investment counselling firm for five years and had, in fact, invested in treasury bill futures contracts with Merrill Lynch in 1976.

As a result of conversations and correspondence with Renaudin, plaintiffs began trading in GNMA futures through Merrill Lynch on May 8, 1979. Initial margins of $1,000 per contract were deposited in the form of treasury bills. By July 17, 1979, plaintiffs had agreed to buy, or take delivery of forty-five March, 1981 GNMA instruments, resulting in a net "long" position of forty-five contracts. This position resulted in some profits for the plaintiffs which allowed them to make withdrawals on several occasions. But, in August of 1979, the market in GNMA futures turned downward and, consequently, the market price of Crabtree's forty-five contracts began to decline. As a result of this decline, Crabtree was required to meet several margin calls during the period from August, 1979 to October, 1979. These margin calls were made in accordance with the terms of the Renaudin letter.[10] By October 8, 1979, Crabtree and Crabtree, Inc. had paid a total of $335,837 to maintain the margin requirements on their accounts.

On October 2, 1979, Crabtree "short sold" thirty-five December, 1980, contracts.[11] On October 11, 1979, the plaintiffs short sold ten additional December,

1980 contracts. This caused the plaintiffs to assume a straddled or spread position, which, according to the evidence, was safer than either a net short or a net long position.[12] Because of the reduced risk, the margin requirements of such a position were substantially less. Although these requirements were not part of the "basics" listed in the Renaudin letter, Merrill Lynch's margin requirement for straddled positions at that time was $500.

On October 6, 1979, the Federal Reserve Board (FRB) announced a fundamental change in the policies and procedures in which it would attempt to control inflation. The FRB's announcement plunged the market into a period of volatility. It was generally agreed that the FRB's new policy would increase interest rates and, Merrill Lynch felt that the interest market changes would be dramatic. Because such volatility could have a tremendous impact on GNMA futures, Merrill Lynch decided to attempt to cover some of the risk by increasing the margin requirements on GNMA futures trading. Thus, on October 10, 1979, Renaudin informed Crabtree of the margin increase which was to become effective on October 12, 1979.[13]

Merrill Lynch's increased margin requirements were $3,000 for each open position held on October 12, 1979, and $4,000 for each newly opened position thereafter. The margin on straddled positions was increased to $800. While these margins were greater than the $2,000 per contract required by the Chicago Board of Trade as of October 23, 1979, the evidence revealed that it was not unusual for a brokerage firm to require margins in excess of those required by the CBT.[14]

---

10. When the equity in the Crabtree accounts fell below $750 per contract, Crabtree had to provide cash to restore the margin to $1,000.

11. In other words, Crabtree agreed to sell, or to make delivery on, thirty-five GNMA instruments in December, 1980.

12. This "safe" position occurs because declines in the value of the March 1981 long contracts tended to be offset by gains in the equal number of December 1980 short contracts.

13. On October 10, 1979, the plaintiffs held a net long position of ten March 1981 contracts. However, as noted earlier, the plaintiffs assumed a straddled position the next day.

14. The margins set by the CBT are merely minimums below which the member broker cannot go.

On October 23, 1979, Renaudin and Stone informed Crabtree that they were attempting to obtain a waiver of the increased margins on the plaintiffs' accounts from the New York Credit Department of Merrill Lynch. This waiver request was made, but was denied by the defendant.[15]

On November 2, 1979, Crabtree closed five short December, 1980 positions in each account. On November 5, 1979, Merrill Lynch made margin calls in both of plaintiffs' accounts to bring the margin to $3,000 for each of the ten open positions. Crabtree was also informed that if the plaintiffs did not meet the margin call by 10:00 a.m. on November 6, 1979, plaintiffs' accounts would be liquidated. On November 6, 1979, Crabtree wrote a letter[16] to Merrill Lynch in which he refused to meet the margin calls at $3,000 per contract and stated that he would hold Merrill Lynch responsible for present losses and potential profits if plaintiffs' accounts were liquidated. A check was enclosed with this letter in an amount which Crabtree determined to be "in full satisfaction" of the old margin requirements. Merrill Lynch returned this check to the plaintiffs.

On November 7, 1979, Merrill Lynch sold ten of the long March, 1981 positions to bring the accounts back to a spread position. Crabtree did not object to this sale because plaintiffs' also intended to sell some of the long contracts at this point due to capital gains tax implications.

The liquidation of those ten positions did not, however, completely satisfy the November 5 margin call because of the increase in the spread margin from $500 to $800. Furthermore, it was clear that an impasse had developed at this point because Crabtree refused to pay the increased margin for open positions, but could not resume the spread position without establishing new open positions. Therefore, in December, 1979, Crabtree told Renaudin that he wanted to buy back some of his short contracts in order to "get the positions moving". Renaudin told Crabtree that this would result in liquidation unless the plaintiffs paid the new margins. On December 26, 1979, Merrill Lynch liquidated the plaintiffs' accounts and returned the balances to Crabtree and Crabtree, Inc.

■ The Court finds that the plaintiffs have failed to show that the defendant was guilty of fraud, deceit, misrepresentation or unethical conduct. There was no evidence presented at trial which indicated that Merrill Lynch intentionally misled or deceived the plaintiffs. It is clear that Merrill Lynch informed Crabtree of the coming change in the margin requirements before the change actually became public on October 11, 1979. At this time, the plaintiffs were free to liquidate their accounts and re-open their trades through another broker. The letter written by Renaudin on May 8, 1979, upon which the plaintiffs allegedly relied clearly states that all margins were subject to change without notice. It further states that it merely represents the "basics" of dealing in GNMA futures through Merrill Lynch. These acts show the lack of an intent to deceive on the part of Merrill Lynch. It cannot be said that the Renaudin letter was such that it was likely to deceive.

The change in the margin requirements was brought about by forces outside the control of Merrill Lynch. The futures market in interest-rate-sensitive instruments became very volatile following the FRB's announcement of a change in policy in early October of 1979. While Merrill Lynch was one of the first firms to act in response to this announcement, many other investment firms as well as the Chicago Board of Trade did raise their margin requirements within a few days of the FRB's announcement.

■ The plaintiffs place great weight on the effect of the denial of a "waiver" of the new margin requirements by Merrill Lynch's home office. They have not, however, demonstrated that the defendant had any duty to seek a waiver or had any obligation to grant the requested waiver.

---

**15.** Merrill Lynch did grant waivers to some customers on some contracts.

**16.** Exhibit P-3.

The Court finds that Merrill Lynch's decision to deny a waiver in this case was made in good faith, particularly in light of the substantial losses sustained by the plaintiffs in this market prior to the implementation of the new margin requirements.

■ The plaintiffs also argue that Merrill Lynch actually benefited from the use of its customers' margin funds to show a breach of fiduciary duty or unfair trade practice on the part of Merrill Lynch. The plaintiffs do not, however, contend that Merrill Lynch put the segregated funds to any improper use.[17] The Court does not believe that this evidence demonstrates bad faith on the part of Merrill Lynch.

■ Section 4d of the Commodity Exchange Act,[18] does require a futures commission merchant to separately account for its customers' funds which must be treated as belonging to the customers. But Section 4d does allow investment of customer funds in government and government-guaranteed instruments and, also permits the Commission to regulate the use of these segregated accounts. A futures commission merchant is permitted to retain interest from the authorized investment of customer funds. 17 C.F.R. § 1.29.

As noted earlier, a margin is a deposit in a customer's account to protect the broker from losses caused by the daily fluctuations in the account. It is possible for the broker to gain some benefit from the proper maintenance of the customers' account. However, if margins are not set at a high enough level, the broker is subject to losses from rapid declines in a customer's position.

The Chicago Board of Trade allows members to set higher margins than those maintained by the Board. It is apparently competition among brokers which keeps the margins down. It is clear that Crabtree was free to change brokers when he was notified of Merrill Lynch's margin increase. The fact that Merrill Lynch can make or lose money on customers from the level at which it sets its margin does not demonstrate bad faith. Furthermore, it is clear that the decision to increase the margin requirements was based on the market conditions and not on a desire on the part of the defendant to earn additional profits from their clients' margin deposits.

Because the plaintiffs have failed to show by a preponderance of the evidence that Merrill Lynch was in bad faith or that it was guilty of fraud or breach of trust, or that it engaged in any misrepresentation or other deceptive or unethical practices, the plaintiffs claims under the Commodity Exchange Act, the Louisiana Unfair Trade Practices and Consumer Protection Law and for breach of fiduciary duty under Louisiana law must be dismissed.

[10, 11] The Court also finds that plaintiffs' breach of contract claim is without merit. The plaintiffs seek to rely solely on the terms of the Renaudin letter as a contract between the parties. This contention is not supported by the evidence. The Renaudin letter clearly states that it only represents the "basics" of dealing in GNMA futures through Merrill Lynch. The letter invited questions from Crabtree regarding other aspects of futures trading. This letter did not purport to be an offer which could bind Merrill Lynch to its terms if it was accepted by Crabtree. The Court also finds that the letter was not evidence of an intent to be bound.[19] The Renaudin letter is more appropriately labeled as an informational communication of Merrill Lynch's current margin requirements upon which Crabtree could base his decision of whether to trade with Merrill Lynch, with another broker, or not at all. The mere listing of current margin requirements does not amount to a promise to trade at that level for all times in the future irrespective of current market conditions. *Baker v. Edward D. Jones & Co.*, (CFTC No. R76–4, January 27, 1981).

■ However, even if the Court did find the Renaudin letter to be a binding

---

17. In fact, evidence of this use was admitted by the Court only to show bad faith on the part of Merrill Lynch in raising the margin requirements.

18. 7 U.S.C. § 6d.

19. See La.C.C. arts. 1797, 1798, and 1802.

offer by Merrill Lynch which was accepted by Crabtree merely by the commencement of trading, plaintiffs still cannot recover for breach of contract. The letter states in part: "margins are subject to change without notice." J. Sanders Cocke testified that this sentence was inserted in the Renaudin letter because of a dispute which occurred in 1976 when Merrill Lynch had raised margins on existing positions in Crabtree's account. While Crabtree paid the increased margins at that time, Cocke wanted to make it clear that these changes could be made on margins before Crabtree began trading again. The plaintiffs assert that the sentence is ambiguous and that this ambiguity should be construed against Merrill Lynch which drafted the letter.[20] The Court finds, however, that the sentence in question is subject to only one reasonable interpretation—Merrill Lynch could change the margin requirements at any time without notice.

Thus, even if the Court did treat the Renaudin letter as a binding offer, the parties would be bound by their intent as unambiguously expressed in the written "agreement".[21] Accordingly, the plaintiffs' breach of contract claim must also be dismissed.

■ Finally, the plaintiffs contend that Merrill Lynch wrongfully liquidated their accounts. Paragraph 3 of the Commodity Account Agreement allows Merrill Lynch to liquidate a customer's account "whenever in [Merrill Lynch's] discretion [it] considered it necessary for [Merrill Lynch's] protection".

The evidence presented at trial revealed that Crabtree and Crabtree, Inc. had sustained large unrealized losses in their accounts. When Merrill Lynch increased its margin requirements, Crabtree refused to meet the demand. Crabtree could not get the accounts into an open position without paying the increased margins. Furthermore, the increased margin on straddled positions had not been met. It is undisputed that an impasse had been reached. Crabtree had the option to either liquidate his accounts, move them to another broker, or pay the increased margin. He chose to take no action.

The futures market in which the plaintiffs were trading was in a volatile state. The Court has already determined that Merrill Lynch was within its rights in raising its margin requirements. Under these circumstances, the Court cannot find Merrill Lynch was arbitrary or unreasonable in exercising its authority under the contract to protect itself by liquidating the plaintiffs' accounts.

Plaintiffs cite three cases to support their claim that Merrill Lynch was arbitrary or unreasonable when it liquidated plaintiffs' accounts. *D.F.P. International, Inc. v. Hofmann, Kavanagh Commodity Corp.,* (CFTC No. 77–482–7877, March 12, 1979); *Cohl v. Floor Brokers Associates,* (CFTC No. 78–181–78–209, March 12, 1974); *Ruddy v. First Commodity of Boston,* (CFTC No. R 76–24, April 6, 1979). However, these cases are factually distinguishable from the case now pending before this Court.[22] Therefore, plaintiffs' claim for wrongful liquidation or conversion must also be dismissed.

Thus, the Court finds that plaintiffs' suit must be dismissed.[23]

---

**20.** See La.C.C. art. 1957.

**21.** La.C.C. art. 1945(3).

**22.** In *D.F.P. International, Inc. v. Hofmann, Kavanagh Commodity Corp.,* the Administrative Law Judge found:

there were positive misrepresentations of such risks; and there was a fraudulent failure to execute an accepted liquidation offer. CCH. Commodity Futures Law Reports, p. 23,179.

Such are not the facts in this case.

In *Cohl v. Floor Brokers Associates,* the Administrative Law Judge also found a failure to follow a customer's stop order request. The issue of when a broker may liquidate a customer's account to protect its interest was not involved in that case.

Finally, the findings that there was a lack of adequate basis on the part of the broker for a trade recommendation made to a customer in *Ruddy v. First Commodity of Boston,* are not present in this case.

**23.** Because of the Court's finding as to liability, no determination of damages will be made by the Court. It is clear, however, that the damages alleged by the plaintiffs are extremely spec-

Finally, defendant claims that it is entitled to recover attorney's fees from the plaintiffs pursuant to La.R.S. 51:1409(A).[24] Under this statute, a party is entitled to recover attorney's fees if a groundless unfair trade practice claim is brought in bad faith. The Court cannot say that plaintiffs' claims were brought in bad faith. Therefore, defendant's request for attorney's fees is hereby denied.

For reasons set forth above:

1. Plaintiffs' suit against Merrill Lynch is dismissed with prejudice at plaintiffs' costs.

2. Merrill Lynch's request for attorney's fees is hereby denied.

Judgment shall be entered accordingly.

ulative. The plaintiffs were dealing on the open commodities market where prices fluctuate drastically as was demonstrated by the evidence. It is easy to say, in hindsight, when a particular sale would or should have been made. There is no indication why the plaintiffs could not have re-entered the market through Merrill Lynch or another broker the day after the accounts were liquidated. The plaintiffs could have also paid the increased margin under protest to reserve their rights to the above mentioned damages. The plaintiffs have also sought loss of profits over a much longer period than a few days. Even if liability had been found, the plaintiffs' duty to mitigate damages would have precluded the Court from finding the level of damages alleged by the plaintiffs. See *Chipser v. Kohlmeyer & Co.*, 600 F.2d 1061 (5th Cir.1979).

24. L.R.S. 51:1409(A) provides:

"Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use of employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages. If the court finds the unfair or deceptive method, act or practice was knowingly used, after being put on notice by the director or attorney general, the court shall award three times the actual damages sustained. In the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney's fees and costs. Upon a finding by the court that an action under this section was groundless and brought in bad faith or for purposes of harassment, the court may award to the defendant reasonable attorney's fees and costs."