**HAWKEYE CHEMICAL COMPANY, and Mutual Boiler & Machinery Insurance Company, Plaintiffs-Appellees,**

v.

**ST. PAUL FIRE & MARINE INSURANCE COMPANY, Defendant-Appellant,**

and

**Oil Insurance Association, Defendant.**

**Nos. 74–1174, 74–1175.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 21, 1974.

Decided Jan. 20, 1975.

Rehearing and Rehearing En Banc Denied Feb. 11, 1975.

Certiorari Denied May 12, 1975.

See 95 S.Ct. 1955.

Lawrence Zelle, Minneapolis, Minn., Robert A. Downing, Chicago, Ill., C. E. Talley, Tulsa, Okl., for Hawkeye Chemical.

James T. Ferrini, Chicago, Ill., for St. Paul Fire.

Before FAIRCHILD and PELL, Circuit Judges, and WYZANSKI, Senior District Judge.*

WYZANSKI, Senior District Judge.

This diversity jurisdiction case comes before us on an appeal and a cross-appeal from a judgment, following a jury verdict on special questions, which allows plaintiffs a recovery on a fire insurance policy, but denied plaintiffs claimed interest. The central question, involving interpretation of Iowa statutes, is whether two fire insurance policies issued by St. Paul Fire and Marine Insurance Company to Hawkeye Chemical Company, and providing that the issuing "company shall not be liable for loss occurring. . . . while the hazard is increased by any means within the control or knowledge of the insured," were, at the time of Hawkeye's loss, suspended by its violation of a policy condition which did not contribute to that loss.

Hawkeye operates at Clinton, Iowa a nitrogen fertilizer plant. It effectuated with St. Paul two fire insurance policies with the suspension provision just quoted, and with Mutual Boiler and Machinery Insurance Company a policy insuring a boiler and machinery. The St. Paul policies had an extended coverage endorsement for an explosion loss; the Mutual policy also covered explosion damage.

While the policies were in effect, Hawkeye's personnel detected, in its ammonia plant, gas leaks from weep holes in a cold exchanger, a multi-layered pressure vessel where gas was being expelled from the interior. Those leaks increased the fire hazard.

March 30, 1970, during the period named in the three insurance policies,

---

* Senior District Judge Charles Edward Wyzanski, Jr., of the District of Massachusetts, is sitting by designation.

the cold exchanger in Hawkeye's plant exploded causing extensive damages to the exchanger and the plant. After investigation, St. Paul declined coverage. In its pleading in this case, St. Paul gave as its ground that there was a causal connection between leakage which had occurred through weep holes in the cold exchanger before March 31, 1970 and the explosion.

Hawkeye and Mutual (the latter because of its status as a co-insurer) brought, in the United States District Court for the Southern District of Illinois, suit seeking recovery for Hawkeye on the St. Paul policies. Oil Insurance Association, which had acted on behalf of St. Paul, was also named as a defendant. In its defense, St. Paul relied principally upon Section 515.102(8) which, so far as pertinent, provides:

"515.102 Conditions invalidating policy

Any condition or stipulation referring:

\* \* \* \* \* \*

8. To a change in the occupancy or use of the property insured, if such change or use makes the risk more hazardous, . . .

"shall not be changed or affected by the provision of section 515.101."

The citation in the just-quoted statute to section 515.101 is a reference to the following Iowa code provision:

"Any condition or stipulation in an application, policy, or contract of insurance, making the policy void before the loss occurs, shall not prevent recovery thereon by the insured, if it shall be shown by the plaintiff that the failure to observe such provision or the violation thereof did not contribute to the loss."

In the District Court no one suggested that the crucial aspect of the questions of Iowa state law made it desirable for the federal court to abstain from deciding the case, or to withhold decision until, by declaratory judgment or otherwise, the opinion of the Iowa state courts might be elicited.

At trial, the District Judge separated the issues and put special questions, relevant to some issues of liability, to the jury. The court's interrogatories and the jury's answers were as follows:

"No. 1. Was the hazard increased with respect to the Hawkeye pressure vessel known as the Cold Exchanger and Secondary Separator prior to its failure of March 30, 1970?

Answer: Yes.

No. 2. Did the plaintiff, Hawkeye Chemical Company, have knowledge of the increase in hazard found in response to interrogatory No. 1?

Answer: Yes.

No. 3. Was the increase in hazard found in response to interrogatory No. 1 within the control of plaintiff, Hawkeye Chemical Company?

Answer: Yes.

No. 4. Did the increase in hazard found in response to interrogatory No. 1 cause or contribute to the loss occasioned by the catastrophe on March 30, 1970 in the Hawkeye plant?

Answer: No."

Thereafter plaintiffs moved for summary judgment on liability. The court ruled that St. Paul's policies had not been suspended and granted the motion. Then, after denying defendant St. Paul's motion for a new trial, the court set the case for trial without a jury upon the issue of damages. After hearing the evidence, the court entered judgment for Hawkeye against St. Paul in the amount of $1,976,827.37. In so doing, the court denied Hawkeye's claim for pre-judgment interest at 5% beginning at the date the damages had been completed and the plant restored to normal operation.

Defendants appealed to this court from the judgment imposing liability on St. Paul; Hawkeye cross-appealed from the District Court's failure to allow pre-judgment interest.

We dismiss the appeal and direct the District Court to modify its judgment in accordance with the cross-appeal.

Our first inquiry, logically, must be addressed to defendants' contention, made for the first time in this court,

that in view of our unfamiliarity with the mixture of Iowa statutory and case law governing insurance coverage, and, in defendants' view, in the absence of a clear line of decisions in the Iowa Supreme Court on the precise issues here presented, we should either abstain from decision until the parties may procure a response from the Iowa state courts to a petition for declaratory judgment (there being no certification procedure of the type found in some states and under statutes like those recited in footnote 7 of Lehman Brothers v. Schein, 416 U.S. 386, 390, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974)) or, alternatively, reverse the District Court's judgment and dismiss the case.

We recognize that there is no insuperable obstacle to application of the doctrines of abstention even if they are invoked only on appeal. See Lehman Brothers v. Schein, *supra.* However, as Mrs. Justice Rehnquist stressed in that case, pp. 392–395, 94 S.Ct. 1741, it is always relevant to consider not only how difficult it is for a federal court to ascertain the local law, but also how great are the financial or other burdens caused by the delay due to a late claim of abstention. Here, as we shall later demonstrate, we do not find much difficulty in discovering the Iowa law. And we are mindful that, in this era of double digit interest available for large funds, it is a serious matter to delay the payment of almost $2 million upon which there would be payable only about half of the interest which the open market would offer. Therefore, on both grounds, we conclude that this is not an appropriate case for abstention.

We turn to the merits. The governing law, obviously, is that of the state of Iowa. Its usual statutory rule, established by Section 515.101, heretofore quoted, forthrightly states that "any condition . . . in [a] . . . policy . . . of insurance, making the policy void before the loss occurs, shall not prevent recovery thereon by the insured, if it shall be shown by the plaintiff that the failure to observe such

provision or the violation thereof did not contribute to the loss." This language speaks so clearly and to the point that one who has not been inoculated by the virus of insurance policies and statutes governing them would be surprised to know how there could be much dispute as to its effect. However, there is, as always with lawyers, room for argument, and for a delving into precedents, legislative history, and general principles of the common law.

Both sides ask us to examine the legislative history of Section 515.101 and its cognate, Section 515.102. These twins had as their parent Section 1743 of the Iowa Code of 1897 which provides:

"Conditions. Any condition or stipulation in an application, policy or contract of insurance, making the policy void before the loss occurs, shall not prevent recovery thereon by the insured, if it shall be shown by the plaintiff that the failure to observe such provision or the violation thereof did not contribute to the loss: provided, however, that any condition or stipulation referring to any other insurance, valid or invalid, or to vacancy of the insured, or to liens or incumbrances thereon created by voluntary act of the insured and within his control, or to the suspension or forfeiture of the policy during default or failure to pay any written obligation given to the insurance company for the premium, or to the assignment or transfer of such policy of insurance before loss without the consent of the insurance company, or to the removal of the property insured, or to a change in the occupancy or use of the property insured, if such removal, change or use makes the risk more hazardous, or to the fraud of the insured in the procurement of the contract of insurance, shall not be changed or affected by this provision. . . ."

It is obvious that the first portion of the foregoing 1897 statute has become Section 515.101 of the present Iowa Code, and that the remainder of the first sen-

tence after the word, "provided," has become Section 515.102.

It is also plain to those familiar with this country's history of fire insurance that Iowa's 1897 statutory provisions were part of a nationwide movement to change from the strict common law rule that any breach of a policy condition avoided coverage regardless of whether the breach caused the loss or increased the risk to a new rule allowing the insured to recover despite a breach of condition if it did not contribute to the loss sought to be indemnified. See Patterson, Essentials of Insurance Law (1957) § 72, pp. 353–355.

We are aware that in some states, perhaps a majority, there has been what may appear to be some recession from the tidal changes of the early twentieth century. See Note, The Increase of Hazard Clause in The Standard Fire Insurance Policy, 76 Harv.L.Rev. 1472 (1963). We are also mindful that in 1947 Iowa legislatively altered the 1907 Iowa Standard Form Policy of Fire Insurance to conform to the New York Standard Form, that the New York and most other, but not all other, courts have construed the New York form so as to give insurance companies the benefit of an Increase-of-Hazard clause to the prejudice of a generous interpretation of a Contribution-To-The-Loss clause, and that when one state borrows another state's statute the borrowing state is usually presumed to have accepted the borrowed statute as it had previously been interpreted in the state of origin. But we are not now called upon, in the manner of the helpful Harvard Law Review Note already cited, to rehearse with elaborate analysis and citation the history of the New York statute or the conflict in opinions in those states which have borrowed the New York statute. For after Iowa had borrowed the New York statute, the Supreme Court of Iowa in 1951 in Carr v. Iowa Mut. Tornado Ins. Assn., 242 Iowa 1084, 49 N.W.2d 498, where an insurer who relied

on its policy's "increase of hazard" clause as the basis of a refusal to pay a claimed windstorm clause was held liable because the evidence did not prove that the increase of hazard had been by a means within the knowledge and control of the insured, stated:

"It is only when there has been sufficient proof of some act of the insured which would ordinarily abrogate the contract, that section 515.101 has any effect or meaning. Then the insured may show that his action, although technically a violation of some provision of the policy did not in fact contribute to the damage."

Perhaps this was technically not part of the *ratio decedendi;* but we are persuaded that it was a considered *dictum* revealing that today, as since its enactment, Section 515.101 of the Iowa Code ordinarily applied to a case where the defense of "increase of hazard" was relied upon by the insurer to avoid coverage.

■ We are unimpressed by defendants' attempt to avoid liability by reliance on Section 515.102's special provision for two particular kinds of increase of hazard. That statutory section recites nine specific conditions or stipulations upon which non-liability might be premised. Only one of those conditions refers directly or indirectly to increase of hazard. And that is not now relevant. It provides as one of the conditions invalidating a policy. "Any condition or stipulation. . . . To a change in the occupancy or use of the property insured, if such change or use makes the risk more hazardous." What the words say, and what the sense and spirit of the eighth clause suggest, is that an insurance policy may be invalidated if there has been an increase of hazard caused by, and only if caused by, a change in the occupancy or a change in the use of the property. An increase in the hazard due to gas leaks is not either a change in occupancy, or a change in use and is not *ejusdem generis.* It is wholly different.[1]

---

1. We do not pause to comment on appellant's analogy drawn from Commercial Standard Ins. Co. v. Haley, 282 F.Supp. 16 (S.D.Ia. W.D.1968) relating to automobile insurance

No court has authority to extend the statutory catalog of invalidating conditions. In Iowa, as generally elsewhere, the courts are barred from additions to a prescribed list by the maxim *expressio unio est exclusio alterius*. Lindstrom v. Aetna Ins. Co., 203 N.W.2d 623, 627 (1973); North Iowa Steel Co. v. Staley, 253 Iowa 355, 112 N.W.2d 364, 365 (1961).

■ It follows that that clause in the St. Paul policies which provides that the [insurance] "company shall not be liable for loss occurring . . . while the hazard is increased by any means within the control or knowledge of the insured" is inoperative in relation to the facts of this case. The attempt of defendant St. Paul in its policies to avoid liability whenever there has been any increase of hazard is not authorized by Section 515.-102 and is repugnant to Section 515.101. In short, St. Paul's liability is governed not by its contracts but by Section 515.-101, which provides that a policy condition "shall not prevent recovery . . if it shall be shown by the plaintiff that the failure to observe such provision or the violation thereof did not contribute to the loss."

There being no merit to the appeal, we now consider the prayer for pre-judgment interest presented by the cross-appeal.

■ It is undisputed that St. Paul categorically denied policy coverage and instructed Hawkeye that filing of proof of claim was unnecessary. Thus St. Paul waived the policy provisions that claims are payable only 60 days after proof of loss is filed. Under these circumstances, we accept plaintiffs' proposal that the date from which interest became payable was September 24, 1970 when the damages were complete and the plant returned to operation at normal rates, and we ignore any possible earlier date. See Abel v. Dodge, 261 Iowa 1, 152 N.W.2d

823 (1967); Glandon v. Farmers' Mut. Hail Ins., 211 Iowa 60, 232 N.W. 804 (1930); Aetna Ins. Co. v. Barnett Bros., Inc., 289 F.2d 30 (8th Cir. 1961). We suppose that the denial of pre-judgment interest by the District Court was attributable to inadvertent confusion between the rule in insurance contract claim cases and the rule in tort cases presenting unliquidated claims.

The appropriate calculation of interest based on Section 535.2(1) of the Iowa Code may best be made by the District Court on remand.

Defendants' appeals dismissed; plaintiffs' cross-appeals granted; case remanded to the District Court for proceedings in accordance with this opinion.

PELL, Circuit Judge (dissenting).

In my opinion the trial court committed basic and reversible error in submitting the fourth interrogatory to the jury thereby adding an improper issue for jury determination. The error, of course, was compounded by the district court treating the issue as dispositive of the case. Accordingly, I respectfully dissent.

I agree with the majority opinion that the wording of the policy issued by St. Paul cannot override statutory circumscription pertaining to insurance policies.

The key matter here, it appears to me, is one of the legislative wording of Section 515.102(8):

"To a change in the occupancy or use of the property insured, if such change or use makes the risk more hazardous . . . ."

Both the district court and the majority opinion construe the words as follows:

"To a change in the occupancy or use of the property insured, if such change of occupancy or change of use makes the risk more hazardous . . . ."

Such a construction, in my opinion, does violence to the plain meaning of the

policies whose conditions relating to use limitations have a wholly different ambience. The governing considerations in interpreting an increase of hazard clauses in automobile

policies are manifestly different from those used to interpret unique statutory language controlling fire insurance policies.

words. If the legislature had so intended all that need to have been said was:

"To a change in the occupancy or use of the property insured, if such change makes the risk more hazardous . . . ."

By using the combination of words it did, it appears clear to me that the legislature did not intend to modify "use" by "change." A change in occupancy is frequently consistent with a potential increase of hazard. The use of a product in the manner in which it has theretofore been used is just as consistent with an increase of hazard as is a change of use. The district court in defining a change of use used the example of converting an ice cream plant to an anhydrous ammonia plant. On this hypothesis if a boiler was consistently overheated so as to result in an explosion there would be no change of use so as to bring to bear the excepting clause of 515.102(8). This strikes me as an improper narrowing of the plain words of the statute. The increase of hazard from a misuse can be every bit as perilous as from a change of use and I fail to find any logical reason for the legislature to have made one of them inferior to the other in determining what conditions will have the effect of suspending the coverage of a policy. I discern nothing violative of either the sense or spirit of the eighth clause in the construction which appears proper to me.

In writing insurance, the company must perforce look at its potential exposure or risk. The operative time for the suspension of coverage should be logically when the hazard is increased or the conditions upon which the policy was issued change, whether the change of conditions results from misuse or from change of use.

This is the prevailing view:

"It should be made clear that, since the clause is concerned with the area of risk or uncertainty, potential rather than actual causes of loss are relevant to this inquiry. It is true that there are statements in some early cases that a causal link between the changed condition and the actual loss is necessary to establish the defense of increased hazard, and a few states have statutes—denominated contribute-to-the-loss acts—which have the same effect. Yet there is now no dispute among the authorities that the meaning of increased hazard under the language of the standard policy does not turn on whether the changed condition in fact contributed to the particular fire loss. Note, The Increase of Hazard Clause in The Standard Fire Insurance Policy, 76 Harv.L.Rev. 1472, 1474 (1963).

Ordinarily we need not look at legislative history in the absence of ambiguity but may assume where clear and explicit language is used that the legislature meant what it plainly said. Since the present panel is not in agreement as to the proper construction of the statutory section in question it perhaps could be said arguably that the necessity for resort to legislative history is in order.

It appears to me that Section 1743 of the Iowa Code of 1897, quoted in the majority opinion, does support the construction which appears to me to be the correct one. Thus, "or to a change in the occupancy or use of the property insured, if such removal, *change or use* makes the risk more hazardous . . . shall not be changed or affected by this provision . . . ." (Emphasis added.)

I cannot as lightly as does the majority dismiss the opinion of District Judge Hanson, an Iowa lawyer, in Commercial Standard Insurance Company v. Haley, 282 F.Supp. 16 (S.D.Ia.1968). It is true that that case involved an automobile policy but Judge Hanson was addressing an underlying principle of Iowa insurance law. The case upon which the insured relied was Baird v. Kaskaskia Live Stock Ins. Co., 198 Iowa 905, 200 N.W. 575 (1924), a case not involving automobile insurance but concerned with an interpretation of Section 1743. The insured contended that "that a condition or stipulation in an insurance contract making the policy void before a loss occurs cannot prevent recovery unless it is

shown that a violation of the condition contributed to the loss. The correct statement of the rule is that breach of a condition must be shown to have contributed to the loss *or in fact made the risk more hazardous.* Taylor v. National Livestock Co., 192 Iowa 1118, 185 N.W. 992; Kinney v. Farmers' Mutual Fire & Ins. Soc. of Kiron, Iowa, 159 Iowa 490, 141 N.W. 706. There can be no doubt that Haley's breach of the Limitation of Use Endorsement increased the risk for the Company. In the event the Court were to decide otherwise, a universally legal and valid fleet policy clause would be rendered nugatory." (Emphasis added.) 282 F.Supp. at 24–25.

This case is one which would have lent itself ideally to a certification procedure. See Lillich & Mundy, Federal Courts Certification of Doubtful State Law Questions, 18 U.C.L.A.L.Rev. 888 (1971). Unfortunately, we must because of Iowa not having such procedure available embark upon a determination of what the Iowa legislature meant, and have reached unfortunately a result which I do not believe the Iowa courts would have.

As I read the law of Iowa since there was clearly an increase in the hazard it was immaterial whether the increase caused or contributed to the explosion and judgment should have been entered for the defendant. In any event, even assuming *arguendo* that the district court's requirement of cause of contribution was proper there should have been at the very least a new trial ordered on the issues.

The evidence in this case is overwhelming that there was leakage in the weep holes, that the vessel should have been shut down to determine the cause but that this was not done. The inference is clear that the plaintiff ignored warning signals because it was involved in the height of the manufacturing season. The eruption of gas into the atmosphere brought about the inevitable result, an explosion. From the record, it appears equally clear to me that the answer to the fourth interrogatory was in-

consistent with the answers to the first three and therefore a new trial should have been ordered. 9 Wright & Miller, Federal Practice and Procedure: Civil § 2510 at 517–18 (1971).