**Dominic MARCHESE, Plaintiff,**

v.

**SHEARSON HAYDEN STONE, INC., a corporate entity, Defendant.**

**Civ. No. 78–4298–WMB.**

United States District Court, C.D. California.

Sept. 11, 1986.

David Daar, Miller & Daar, Los Angeles, Cal., for plaintiff.

Samuel A. Keesal, Jr., Keesal, Young & Logan, Long Beach, Cal., for defendant.

## ORDER GRANTING MOTION
## TO DISMISS

WM. MATTHEW BYRNE, Jr., District Judge.

Plaintiff, Dominic Marchese, filed this action against Shearson Hayden Stone, Inc. (Shearson), a securities broker and futures commission merchant, seeking a declaratory judgment that "interest and increment" on margin funds maintained pursuant to section 4d of the Commodities Exchange Act (CEA), 7 U.S.C. section 6d (1982 & Supp. III 1985), may not be retained by Shearson in excess of its lawful commission. The action is brought on behalf of a class consisting of all persons, who, within the relevant limitations period, gave money, securities, or property to Shearson to margin, guarantee or secure trades or contracts.

Shearson has moved to dismiss the amended complaint on the basis that it fails to state a claim on which relief can be granted. The central issue presented by this motion is whether under section 4d of the CEA and its attendant regulations the interest and increment earned on margin funds is the property of the futures commission merchant. This Court finds that the futures commission merchant is entitled to retain all interest and increment on margin funds, and the motion to dismiss is granted.

### I.

Investors enter into contracts of purchase or sale of commodities for future delivery as a means of speculating on the price changes in various commodities. The investors do not ordinarily anticipate taking delivery of the commodity, rather, they seek to enter into "offsetting" contracts prior to the delivery date, liquidate their obligations, and reap a profit should the market price move favorably. H.R.Rep. No. 93–975, 93rd Cong., 2d Sess. 1, 149, *reprinted in* 1974 U.S.Code Cong. & Ad. News 5843 (House Report) (only 3% of all futures contracts culminate in delivery). Thus an investor who enters into a contract to purchase a specified quantity of a commodity at a date three months hence, can later sell that contract at a profit, if the price of the commodity has increased. If the price of the commodity decreases, the investor can enter into a contract to sell the same quantity of the commodity on the same date, offset the previous obligation, and realize the loss without taking delivery.

Futures contracts must be fungible so that investors can enter into these offsetting transactions. Accordingly, futures contracts for a given commodity are uniform as to quantity, quality, and time and place of delivery. *See Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 358, 102 S.Ct. 1825, 1829, 72 L.Ed.2d 182 (1982) (*Curran*). The only significant non-standardized feature of a commodities contract is the price. *See Commodity Fut. Trad. Comm. v. Co Petro Marketing*, 680 F.2d 573, 579 (9th Cir. 1982).

Futures trading occurs on exchanges designated as contract markets by the Commodities Futures Trading Commission (CFTC), CEA, 7 U.S.C. section 4a. Generally, an investor makes his futures trades through a Futures Commodities Merchant (FCM), who may be viewed as the commodi-

ties counterpart to a securities broker. In addition to the FCM's role in the exchange, each contract market has an affiliated clearing organization which is substituted as the buyer to every seller, and as the seller to every buyer. This substitution occurs at the end of each trading day; thereafter the contracting parties are obligated only to the clearing organization. *See Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th Cir.1971), *cert. denied*, 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972).

An investor must deposit a specified amount of money with the FCM when he enters into a futures transaction. This deposit, called "initial margin money" or "original margin" insures that the contract will be performed. The FCM, in turn, is required to deposit margin with the clearing organization to secure the investor's futures position.

Contract markets determine the minimum initial margin which must be deposited by the investor, as well as what form the margin may take (cash, Treasury bills or securities). The margin not only varies with each contract market, but with the underlying commodity itself. As the price of the futures contracts fluctuate, the investor may be required to make adjustments to the margin account. If the price moves adversely to the investor's position, his margin will be viewed as declining, and he will be required to deposit additional funds. This "margin call" is necessary to restore the margin account to the initial margin level. On the other hand, if the price moves favorably, the investor may be permitted to withdraw funds from the margin account. *See Crabtree Investments v. Merrill Lynch*, 577 F.Supp. 1466, 1470 n. 8 (M.D.La.1984), *aff'd mem.*, 738 F.2d 434 (5th Cir.1984).

Although the futures market provides investors with a vehicle for speculation, it also serves a number of economic functions. Agricultural producers can use fu-

tures contracts to sell their crops for future delivery, thereby reducing the fluctuation in crop prices from season to season. *Cargill, supra* at 1157–58. Similarly, the producers can use futures contracts to "hedge" against future decreases in the price of their crops, and food processors can use them to "hedge" against future price increases. *Curran, supra* 456 U.S. at 358, 102 S.Ct. at 1829. The investors therefore play a vital role in the futures market, by assuming the risk the producers wish to avoid, and by providing the breadth and volume of transactions necessary to allow producers easy access into the futures market. House Report, *supra*, at 138.

## II.

In 1921, Congress, concerned with manipulation and other abuses in futures trading, sought to exercise federal control over the emerging futures market. The Future Trading Act, ch. 86, 42 Stat. 187 (1921) was enacted, which levied a tax on grain futures contracts not traded on an exchange designated as a "contract market". The Secretary of Agriculture was empowered to designate an exchange as a contract market when that market made provision for the prevention of the manipulation of prices, and the dissemination of misleading information.[1] The original act therefore set up a structure where the exchange policed itself—a structure which has persisted despite the legislation's periodic amendment.

In 1922, the Futures Trading Act was declared unconstitutional by the Supreme Court in *Hill v. Wallace*, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922) as an improper use of the taxing power. Congress responded by deleting the tax provision and enacting the Grain Futures Act, ch. 369, 42 Stat. 998 (1922), which prohibited off-exchange futures transactions.[2] In addition,

---

1. Ch. 86, section 5(c)–(d), 42 Stat. at 188 (codified as amended at 7 U.S.C. section 7(d)).

2. The Grain Futures Act was upheld as a valid exercise of Congress' commerce power, in *Chicago Board of Trade v. Olsen*, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1923).

the new Act provided for misdemeanor penalties for violations of its provisions.[3]

Prior to 1936, brokers commingled customer monies with their own, used customer monies as part of their own working capital, lent customer deposits to other customers, and used customer monies for their own speculative purposes. 80 Cong.Rec. S7856 (1936). Similarly, banks holding customer funds commingled and used these funds as their own. And, in the event of the bankruptcy of a broker or bank, the customers ranked only as general creditors, and suffered considerable losses. *Id.* at S6162.

Congress responded by enacting the Commodities Exchange Act, ch. 545, 49 Stat. 1491 (1936), which broadened the

scope of federal regulation to include other commodities, and set out several new requirements. Significant among the new requirements was section 4d(2), which mandated, *inter alia*, that FCMs treat funds and property received by them "to margin, guarantee, or secure" trades or contracts or accruing "as the result of such trades or contracts" as belonging to the customer. Ch. 545, 49 Stat. 1494.[4] Section 4d(2) further required that customer funds and property be separately accounted for; FCMs were prohibited from commingling customer funds with their own funds, or using customer funds to margin the trades of other customers. Section 4d(2) authorized FCMs to continue investing customer monies, but carefully circumscribed the class of permissible investments.[5]

**3.** Ch. 369, section 9, 42 Stat. at 1003 (codified as amended at 7 U.S.C. section 13(c)).

**4.** Another provision prohibited members of contract markets from defrauding any person in connection with making a futures contract. Ch. 545, 49 Stat. at 1493.

**5.** Section 4d (codified as amended at 7 U.S.C. section 6d) currently reads as follows:
"It shall be unlawful for any person to engage as futures commission merchant or introducing broker in soliciting orders or accepting orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market unless—
(1) such person shall have registered, under this chapter, with the Commission as such futures commission merchant or introducing broker and such registration shall not have expired nor been suspended nor revoked; and
(2) such person shall, if a futures commission merchant, whether a member or nonmember of a contract market, treat and deal with all money, securities, and property received by such person to margin, guarantee or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer. Such money, securities, and property shall be separately accounted for and shall not be commingled with the funds of such commission merchant or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held: *Provided, however,* That such money, securities, and property of the customers of such futures commission merchant may, for convenience, be commingled and deposited in the same account

or accounts with any bank or trust company or with the clearing house organization of such contract market, and that such share thereof as in the normal course of business shall be necessary to margin, guarantee, secure, transfer, adjust, or settle the contracts or trades of such customers, or resulting market positions, with the clearinghouse organization of such contract market or with any member of such contract market, may be withdrawn and applied to such purposes, including the payment of commissions, brokerage, interest, taxes, storage, and other charges, lawfully accruing in connection with such contracts and trades: *Provided further,* That in accordance with such terms and conditions as the Commi may prescribe by rule, regulation, or order, such money, securities, and property of the customers of such futures commission merchant may be commingled and deposited as provided in this section with any other money, securities, and property received by such futures commission merchant and required by the Commission to be separately accounted for and treated and dealt with as belonging to the customers of such futures commission merchant: *Provided further,* That such money may be invested in obligations of the United States, in general obligations of any State or of any political subdivision thereof, and in obligations fully guaranteed as to principal and interest by the United States, such investments to be made in accordance with such rules and regulations and subject to such conditions as the Commission may prescribe.
It shall be unlawful for any person, including but not limited to any clearing agency of a contract market and any depository, that has received any money, securities, or property for deposit in a separate account as provided in paragraph (2) of this section, to hold, dispose of, or use any such money, securities, or property

In 1968, the CEA was amended, once again broadening the scope of the legislation and strengthening the enforcement provisions. The Secretary was authorized to disapprove contract market rules which violate the statute or its regulations, and suspend the contract market if it failed to enforce its rules.[6] Congress further amended the statutory scheme with the passage of the Commodity Futures Trading Commission Act of 1974, Pub.L. 93–463, 88 Stat. 1389 (1974), and the Futures Trading Act of 1978, Pub.L. 95–405, 92 Stat. 865 (1978), respectively. These amendments created the Commodities Futures Trading Commission to take over the Secretary of Agriculture's responsibilities and discharge new obligations. Like the earlier enactments, the amendments also expanded the statute's coverage and increased penalties for its violation.[7]

Finally, in 1982, Congress reexamined the statutory scheme and enacted the Futures Trading Act of 1982, Pub.L. 97–444, 96 Stat. 2294 (1982). The Act reauthorized the Commodity Futures Trading Commission for another four years. It also settled a bitter jurisdictional dispute between the CFTC and SEC over new financial products such as stock index futures, and various types of options. And, significantly, it expressly provided for a private right of action for violation of its provisions.

### III.

Dominic Marchese entered into a series of Commodity Customer Agreements with Shearson during the period when he employed Shearson as his futures commission merchant. One of these agreements contained an arbitration clause that was set off from the rest of the contract and separately endorsed.[8]

After the filing of the complaint in this class action, Shearson moved for a stay of the action, pending arbitration with the plaintiff before a panel designated by the New York Stock Exchange. This Court granted the stay, and, by Order dated June 3, 1983, later confirmed the arbitrators' unanimous rejection of plaintiff's claim.

Marchese appealed, arguing that his claim was inappropriate for arbitration. The Ninth Circuit Court of Appeals agreed, reversing this Court's confirmation of the arbitration award, and finding that "this action only involved an interpretation of a statute." *Marchese v. Shearson Hayden Stone, Inc.*, 734 F.2d 414, 421 (1984). The case was remanded to this Court for an interpretation of section 4d of the CEA.[9]

The Court's interpretation of section 4d(2) is made in the context of a motion by Shearson to dismiss the amended complaint for failure to state a claim. Prefatorily, the Court notes that Marchese objects to consideration of section 4d(2) in this motion

as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant."

6. Pub.L. 90–258, sections 15 and 23, 82 Stat. 26, 30 and 33 (codified as amended at 7 U.S.C. sections 8 and 12a).

7. For a more complete discussion of the general legislative history of the Commodities Exchange Act, its predecessors and successors, *see Curran, supra* 456 U.S. at 360–67, 102 S.Ct. at 1830–34.

8. The arbitration agreement provided, in pertinent part: "Any controversy arising out of or relating to my account, to transactions with you for me to this agreement or the breach thereof, shall be settled by arbitration in accordance with the rules, then in effect, of the American Arbitration Association or the Board of Di-

rectors of the New York Stock Exchange, Inc. as I may elect. If I do not make such an election by registered mail addressed to you at your mail office within five days after demand by you that I make such election, then you make such election. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof."

9. Marchese brought another action against Shearson on August 22, 1979, claiming that Shearson breached a fiduciary duty owed Marchese in its handling of a speculative account in orange juice futures. That case was similarly stayed by this Court pending arbitration, and both cases were consolidated on appeal. The Ninth Circuit affirmed this Court's decision to stay the fiduciary duty claim raised in the 1979 action. Shearson ultimately prevailed on this claim before the arbitration panel.

to dismiss. Plaintiff's argument appears to be that an "actual controversy" exists entitling him to a declaratory judgment, "even if it is ultimately against his contentions." (Opposition, page 17). But plaintiff confuses the threshold jurisdiction requirements of Article III, and the Declaratory Judgment Act, 28 U.S.C. section 2201 (1982 & Supp. II 1984), with the pleading requirement that plaintiff state a legally sufficient claim upon which relief can be granted. "Proceedings under the Declaratory Judgment Act are governed by the same pleading standards that are applied in other federal civil actions. Thus, it is necessary for plaintiff to state ... the claim upon which relief can be granted...." 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1238, at 202 (1969). If section 4d(2) permits FCMs to retain all interest and increment earned on a customer's margin account then the amended complaint has failed to state a claim upon which relief can be granted. Accordingly, the Court may now consider section 4d(2) to determine whether dismissal would be appropriate.

### IV.

Where as here, resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.

*Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

The first sentence of section 4d(2) of the CEA, 7 U.S.C. section 6d, requires that an FCM "treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of trades or contracts, as belonging to such customer." Plaintiff points to this language as a clear expression of Congress' intent that interest and increment gained as a result of the FCM's deposit or investment of the customer's margin deposits "belongs" to the customer.

The statutory language does not express any intention by Congress that interest and increment gained on margin funds is the property of the customer. In fact, if any inference can be drawn from the text, it is that Congress intended that such interest and increment need not be treated as belonging to the customer. By its terms, this subsection provides that only two categories of funds, securities or property, be treated as belonging to the customer— those received by the FCM to margin, guarantee or secure trades or contracts, and those accruing to such customer as a result of trades or contracts. The last proviso of section 4d(2) specifically allows FCM's to invest margin funds in certain securities. If Congress intended that income gained as a result of the FCM's investment of the margin was to be treated as belonging to the customer, it could have included this income with that "resulting from trades or contracts," within its provision for monies "accruing to such customer." [10]

Plaintiff also relies on the last sentence of section 4d, which makes it unlawful for any person that has received money, securities or property for deposit in a margin account, "to hold, dispose of, or use any such money, securities, or property as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant." [11] However, this language, which

10. Under these circumstances, the principle *expressio unio est exclusio alterius* (expression of one is exclusion of others) might apply. *E.g., Hawkeye Chemical Co. v. St. Paul Fire & Marine Insurance Co.,* 510 F.2d 322, 327 (7th Cir.1975), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975).

11. Other provisions of section 4d(2) require the FCM to separately account for such money, securities, or property, and prohibit the FCM from either commingling these assets with his own funds or using them to margin or guarantee the trades or contracts, or to secure and extend credit of any other customer.

The money, securities, or property of one customer may be commingled in the same account with the funds of another, for purposes of convenience. And the share of that money that is required to "margin, guarantee, secure, transfer,

merely extends to banks and depositories the requirement that customer funds not be treated as belonging to the FCM or other customers, or used to offset the liabilities of the FCM, does not speak to the interest and increment in question.[12]

While Congress has been silent or ambiguous in its statutory language on this issue, the regulatory body charged with implementing the statute has expressed itself clearly. Regulations 1.25 through 1.29, originally promulgated in 1937, deal specifically with the investment of customer funds, and the rights to resulting increment and interest.[13] Regulation 1.25 sets out those investments permitted under section 4d(2), and requires that such investments be made through customer accounts, and that proceeds from the sale of the obligations be redeposited in such accounts.[14] Regulation 1.29 specifically allows the FCM to retain the increment or interest resulting from investment of customer funds. It provides that "[t]he investment of customer funds in obligations described in section 1.25 shall not prevent the futures commission merchant or clearing organization so investing such funds from receiving and retaining as its own any increment or interest resulting therefrom." 17 C.F.R. section 1.29 (1984).[15]

Where a statute is ambiguous, the interpretation of the statute by the agency charged with administering its provisions is entitled to great weight. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). This is particularly true, where, as here, the administrative body's interpretation is "longstanding and consistent." *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978).[16] Moreover, if

---

adjust, or settle the contracts or trades of such customers, or resulting market positions," may be withdrawn for such purposes, including "the payment of commissions, brokerage, interest, taxes, storage, and other charges, lawfully accruing in connection with such contracts and trades."

*See* n. 5, *supra.*

**12.** *See* S.Rep. No. 947, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code., Cong. & Ad.News 1673, 1679; H.R.Rep. No. 743, 90th Cong., 1st Sess. 4–5 (1967).

**13.** Regulations 1.25–1.29, 2 Fed.Reg. 1223–28 (1937), *currently,* 17 C.F.R. sections 1.25–1.29 (1984).

**14.** 17 C.F.R. section 1.25 currently provides that: "No future commission merchant and no clearing organization shall invest customer funds except in obligations of the United States, in general obligations of any State or of any political subdivision thereof, or in obligations fully guaranteed as to principal and interest by the United States. Such investments shall be made through an account or accounts used for the deposit of customer funds and proceeds from any sale of such obligations shall be redeposited in such account or accounts."

**15.** Regulations 1.26 and 1.27 require that the FCMs must segregate and separately account for the investment of customer funds, and further require the maintenance of detailed records concerning such investments. 17 C.F.R. sections 1.26, 1.27 (1984).

Regulation 1.28 requires that the FCM maintain such obligations in their segregated account at values that do not exceed current market value. See Opinion of the Solicitor, Department of Agriculture (Sept. 11, 1941). Since the FCM must maintain funds in the account in an amount equal to the amount deposited by the customer and the profits realized on the customer's futures transactions, the FCM must add its own funds to the account if the value of the obligations decreases. See Opinion of the Associate Solicitor, Department of Agriculture (March 17, 1949). The FCM therefore bears the risk of a decline in the value of the investments.

**16.** The commission charged with administering the CEA has consistently viewed section 4d(2) as allowing the FCM to retain any interest and increment on margin funds invested. See Opinion of the Solicitor, Department of Agriculture (Sept. 11, 1941) (FCM shall receive any profit or income from such investment, thereby encouraging him to assume the risk of investment); Administrative Determination No. 131, Opinion of the Administrator, Commodity Exchange Authority (August 8, 1947) ("futures commission merchant receives any increment on such securities and bears any loss arising from their decline in value"); Administrative Determination No. 150, Opinion of the Administrator, Commodity Exchange Authority (July 22, 1953) (futures commission merchant not prevented from "retaining as his own any increment or interest resulting therefrom").

The Commodities Futures Trading Commission has also made its interpretation of section 4d and regulation 1.29 known to Congress. See Hearings on H.R. 31 and H.R. 32, Subcomm. on Civil and Constitutional Rights, House Comm. on the Judiciary, 94th Cong., 2d Sess. 2377, 2398

Congress has explicitly left a gap in a statute for the agency to fill, such "legislative regulations" are entitled to "controlling weight" unless they are "arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A. Inc. v. Natural Resources Defense,* 467 U.S. 837, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). If the legislative delegation to the agency is implicit, the court must defer to a "reasonable interpretation" of the agency head. *Id.*

Section 4d expressly provides that investments of margin funds shall be made "in accordance with such rules and regulations and subject to such conditions as the Commission may prescribe." The Commission is thus given the power to determine the procedures which FCMs must follow when investing customer funds. Yet this language does not explicitly delegate to the Commission the authority to decide who is entitled to the interest and increment earned on those investments. This delegation, if made at all, was made implicitly. It

therefore becomes incumbent on this Court to review the legislative history of the CEA to determine whether the Commission's interpretation of this section is both reasonable and consistent with Congressional intent. *See Lawrence County v. Lead-Deadwood School Dist. No. 40-1,* 469 U.S. 256, 105 S.Ct. 695, 699, 83 L.Ed.2d 635 (1985).

Prior to the enactment of the CEA and section 4d(2), futures commission merchants commingled customer funds with their own funds and used customer funds for their own business purposes. As a result, when commission firms went bankrupt customer funds were lost.[17] The House version of section 4d(2) attacked these abuses by prohibiting any investment of customer funds by the FCM.[18] This blanket prohibition was rejected by the Senate, which felt that FCMs should be able to invest customer funds in trustworthy securities.[19] The Senate therefore introduced an amendment to section 4d(2) which would allow FCMs to use margin funds for certain investments.[20] The

---

n. 29 (Statement of CFTC Chairman 1976) ("Regulation 1.29 does permit the futures commission merchant to retain all profits on such investments"); Hearings on SEC/CFTC jurisdictional Issues, Subcomm. on Telecommunications, Consumer Protection, and Finance, Subcomm. on Oversight and Investigations, House Comm. on Energy and Commerce, 97th Cong., 2d Sess. 233-34 (CFTC Supplementary Statement 1982) ("By law, the broker may keep any interest earned on the funds deposited by futures customers").

17. During the Senate debate over what would become section 4d(2), Senator Pope summarized the problem. He stated that customer margin deposits: "[h]ave been intermingled with the funds of these futures commission merchants, and have been used by them in the conduct of their own business. They have not been held intact for the benefit of the traders. It further appears that certain favored dealers have not been required actually to put up the money for margins, and have been extended credit in that respect. This gives these favored dealers an advantage. In some instances, large commission firms have become bankrupt and the funds placed with them by a large number of dealers were lost." 80 Cong.Rec. S6162 (1936).

18. The House version of section 4d(2) reads as follows:

"(2) such person [the FCM] shall ... treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person or accruing to such customer as the result of such trades or contracts as belonging to such customer. Such money, securities, and property shall not be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held; Provided, *however,* That such money, securities, and property may be deposited or pledged separately and apart or commingled with the deposits and pledges of such person with any bank or trust company and that such share thereof as shall be necessary to margin, guarantee, or secure the contracts or trades of such customer carried with the clearing house organization of such contract market or with a member of such contract market, may be deposited or pledged with such clearing house organization or with such member." H.R. 3009, 74th Cong., 1st Sess. section 4d(2) (1935).

19. See 80 Cong. Record S6612-13 (Remarks of Senator Pope 1936) ("[C]ommission merchants ought to have the right to invest this money in good securities").

20. The relevant proviso stated that:
"Such money may be invested in obligations of the United States, in general obligations of

amendment accommodated the twin aims of the section, "to protect properly the margin of the customers and to provide some limitation under which the commission men may use that money to invest." 80 Cong.Rec. S7911 (1936) (Remarks of Senator Norris). The House later approved the bill as amended, and it was signed into law as the Commodity Exchange Act. Ch. 545, 49 Stat. 1491 (1936).

This legislative history illustrates that Congress could have completely prohibited FCMs from investing customer funds. Instead, it chose to curb the previous abuses by limiting the category of permissible investments, thereby allowing merchants to continue benefitting from the use of customer funds. The inference that Congress intended the FCMs to profit from investment of customer margin is strengthened by the fact that the FCMs are given discretion as to whether they will make such investments. FCMs would have little incentive to exercise their discretion to invest margin funds if they were unable to retain the interest and increment.[21] If Congress

wished that FCMs invest margin funds for the benefit of the customers, it could have made the FCMs trustees, and required that they invest the funds and turn over the profits.[22]

Since the enactment of the CEA, Congress has periodically reviewed and amended the statutory scheme governing futures transactions. In particular, Congress has amended section 4d(2) on two occasions. Yet during the course of those amendments, Congress chose not to disturb the practice of permitting FCMs to retain interest and increment on margin funds. Section 4d(2) was first amended in 1968, when Congress repealed the provisions allowing FCMs to invest customer funds in "investment securities" and allowing FCMs to loan margin funds secured by warehouse receipts. As part of the 1968 revision of the Act, Congress also added a provision to section 4d(2) requiring that clearing house organizations and other depositories treat and deal with margin funds as the property of the customer.[23]

any State or of any political subdivision thereof, in obligations fully guaranteed as to principal and interest by the United States, and in 'investment securities' as defined in and under the Authority of Section 5136 of the Revised Statutes, as amended, and, subject to approval by the Secretary of Agriculture, may be loaned on the security of negotiable warehouse receipts conveying or securing title to readily marketable commodities to the extent of the current loan value of such receipts, such investment and loans to be made in accordance with such rules and regulations and subject to such conditions as the Secretary of Agriculture may prescribe." 80 Cong.Rec. S7910 (1936).

**21.** This is particularly true in light of the regulatory history of the section. The FCM must put his own funds in the customer account if the value of the investment declines. The FCM would have little reason to take this risk without the prospect of realizing a profit on the investment.

The FCM may deposit customer funds in a bank or other depository. However, section 4d(2) has been interpreted to require that such deposits be made in demand accounts, which are available for immediate withdrawal and do not earn interest. *See, e.g.,* Administrative Determination No. 29, Commodity Exchange Administration (Sept. 28, 1937). Unless the FCM accepts the risk of investment, therefore, the

margin funds remain idle and without earning potential.

**22.** Plaintiff argues that this is precisely what Congress did. But the Congressional record indicates that Congress specifically rejected the formation of a "trust" relationship. H.R. 8829, 73d Cong., 2d Sess. (1934) required FCMs "to treat and deal with as *trust funds* all money, securities, and property received by such person to margin, guarantee, or secure" futures transactions (emphasis added). This trust terminology was opposed by industry spokesmen as a technical phrase connoting a wealth of legal literature and conflicting court decisions. See H.R.Rep. No. 1637, 73d Cong., 2d Sess. 40–41 (1934); Hearings on H.R. 8829, House Comm. on Agriculture, 73rd Cong., 2d Sess. 149. When the bill was reintroduced in 1935, the trust language was deleted and replaced with language requiring that customer funds were to be treated "as belonging to such customer." That language has remained until the present day.

**23.** The 1968 amendment to section 4d(2) provides as follows:

"It shall be unlawful for any person, including but not limited to any clearing agency of a contract market and any depository, that has received any money, securities, or property for deposit in a separate account as provided in paragraph (2) of this section, to hold, dispose of,

Plaintiff argues that the 1968 amendments to section 4d(2) were enacted over industry objection, and designed to "close any loopholes concerning the merchants' use of customer funds and property." (Opposition, pages 10, 40). However, this interpretation is not borne out by the legislative record.[24] Rather, the amendment imposed on clearing house organizations and other depositories the same responsibilities already imposed on FCMs; it prohibited customer funds from being used to offset FCM liabilities, and other abuses. As the Senate Report summarized the effect of the new provision:

> Section 6(b) adds a new provision to section 4d of the Act which makes it unlawful for banks, clearing agencies of contract markets, or any other persons with whom futures commission merchants deposit customers' funds to treat such funds as belonging to any person other than such customers. This is to prohibit

expressly customers' funds from being used to offset liabilities of the futures commissions merchants or otherwise being misappropriated.

S.Rep. No. 947, 90th Cong.2d Sess. 7, *reprinted in* 1968 U.S.Code Cong. & Ad. News 1673, 1679; *accord* H.R.Rep. No. 743, 90th Cong., 1st Sess. 4–5 (1967); *see also* Act to Amend the Commodity Exchange Act, Hearings on H.R. 11930, House Comm. on Agriculture, 90th Cong., 1st Sess. 51 (1967) (Statement of Assistant Secretary of Agriculture).

Section 4d(2) was next amended in 1978, granting the Commission the power to regulate the terms under which FCMs could commingle customer funds deposited in connection with futures trading with other funds required to be segregated. Again, Congress chose not to prohibit from FCMs retaining the interest and increment on margin funds.[25]

---

**24.** Plaintiff places firm reliance on the statement of E.B. Harris, President of the Chicago Mercantile Exchange, in his statements before Congress. Mr. Harris testified on his understanding of amendment as follows:

"Section 4d, pages 5–6, the new paragraph to be added at the end of the section would require that segregated funds be held as belonging to the customer rather than the depositing commission merchant. Obviously, then, interest earned on such deposited money would have to be turned over to the customer. Traditionally, margin deposits have been made and brokerage firms have employed those deposited funds to realize part of earnings. The fact that in this instance such deposited funds must be specifically segregated should not result in a complete reversal of practice. Many brokers rely upon such earnings as the difference between profit and loss." Hearings Before the House Committee on Agriculture. 90th Congress, 1st Sess. on H.R. 11930 and H.R. 12317, 133, 135–6.

However, Mr. Harris' concern that FCMs would no longer be able to retain the interest and increment on margin funds was specifically addressed by then Secretary of Agriculture Orville Freeman, who felt compelled to "correct some of the erroneous statements and misunderstandings that were expressed in testimony before the Committee." Hearings on H.R. 11930, House Comm. on Agriculture, 90th

Cong., 1st Sess. 161, 163 (1967). Secretary Freeman clarified that the amendment to 4d(2) did not change the existing practice. He reported the following:

"He [Mr. Harris] also takes exception to that language in Section 4d which 'would require that segregated funds be held as belonging to the customer rather than the depositing commission merchant.' The entire philosophy of the parts of the Act dealing with customers' funds is that these funds do belong to the customer and not to the commission merchant. This has been the fact ever since the enactment of the legislation." Id. at 163 (emphasis in original).

Secretary Freeman's statements indicate that the amendments merely extended the requirement that FCMs treat and deal with customer funds as belonging to the customer, to banks and other depositories.

**25.** During the 1974 review and revision of the statutory scheme, section 4d(2) was left untouched. The section was also preserved in 1982, when the Commission made several statements regarding the FCMs' use of margin funds. See SEC/CFTC Jurisdictional Issues, Hearings on H.R. 5447, H.R. 5515, and H.R. 6156, Subcomm. on Telecommunications, Consumer Protection, and Finance, Energy and Commerce, 97th Cong., 2d Sess. 215, 233–35, 260 (1982) ("By law, the broker may keep any interest earned on the funds deposited by futures customers"); see also Commodity Futures Trading Commission Reauthorization: Hearings on S. 2109, Subcomm. on Agricultural Research and General

Similarly, regulation 1.29 has been left substantively undisturbed. Its language permitting the FCM to receive and retain "as his own any increment or interest" on margin deposits continues to this day.

The legislative history illustrates that Congress has extensively reviewed the statutory scheme governing futures transactions, and has consistently refused to alter the regulatory structure permitting futures commission merchants to retain interest and increment on margin funds. This history provides a valuable insight into the intent of Congress respecting the proper use of these funds. "Where an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *North Haven Board of Education v. Bell*, 456 U.S. 512, 535, 102 S.Ct. 1912, 1925, 72 L.Ed.2d 299 (1982); *see also Curran, supra*, 456 U.S. at 382 n. 66, 102 S.Ct. at 1841 n. 66 ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."), quoting from *Lorillard v. Pons*, 434 U.S. 575, 580–81, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978).

This Court finds that insight compelling. There is no support for plaintiff's position that Congress intended that futures commission merchants only be able to retain interest and increment to the extent of their lawful commissions.[26] It may be that such a limitation is desirable but that determination must be left to Congress. The language of the statute is ambiguous, but the legislative history is not—Congress intended that futures commission merchants

be entitled to retain any and all interest on their investment of customer margin funds. The motion to dismiss is granted.

Legislation, Senate Comm. on Agriculture, Nutrition, and Forestry, 97th Cong., 2d Sess. 77 (1982).

26. Plaintiff argues that to hold otherwise would render the statute unconstitutional. Plaintiff relies on *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), where the Supreme Court held that

a county's taking of interest accruing on an interpleader fund deposited in the registry of the county court was violative of the Fifth and Fourteenth Amendments. Webb involved "the exaction of a force contribution to general governmental revenues." Id. at 163, 101 S.Ct. at 452. Its narrow holding does not apply here.