**William A. CRAIG, individually and on behalf of those similarly situated, Plaintiff,**

v.

**REFCO, INC., an Illinois corporation, Merrill Lynch Futures, Inc., a foreign corporation, Clayton Brokerage Company of St. Louis, a foreign corporation, and the Futures Discount Group, Inc., an Illinois corporation, Defendants.**

Nos. 84 C 10900, 85 C 4335 and 85 C 0577.

United States District Court, N.D. Illinois, E.D.

Dec. 20, 1985.

Robert A. Holstein, Holstein, Mack and Assoc., Chicago, Ill., for plaintiff.

Thomas P. Luning, Susan R. Lichtenstein, David M. Mason, Schiff, Hardin & Waite, Chicago, Ill., for defendant Refco.

## MEMORANDUM AND ORDER

MORAN, District Judge.

As an investor in the commodities market, plaintiff challenges his futures contract brokers' practice of retaining the interest made by investing plaintiff's margin funds. Plaintiff claims that because section 4(d) of the Commodity Exchange Act (the Act), 7 U.S.C. § 6d, treats such money as belonging to the customer, any interest accrued on such money also belongs to the customer. Defendants argue that while plaintiff's argument sounds logical, it is contrary to congressional intent. They have moved for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the ground that their interpretation of the Act precludes plaintiff's claims. Because the Act has been definitively interpreted as supporting defendants' views, the court grants defendants' motion as to plaintiff's claims based on 7 U.S.C. § 6d.

### I.

Because commodities futures contracts are executory contracts representing a promise to deliver or buy commodities in the future, there is always a risk that when the contract comes due the buyer or seller will default. To protect both parties, each must deposit with the futures contract broker (known as futures commission merchants or FCM) money which serves as a performance bond or earnest money and is called "a margin." The margin serves to protect the broker, as well as the customer, because Exchange rules require the FCM to bear any trading losses not honored by its customers. P.M. Johnson, *Commodities Regulation*, § 1.10 at 32 (1982).[1] Be-

---

1. "Typically, the deposit made by each party    when the futures contract is first entered is

cause of the short-term nature of the risk of default the margin must be extremely liquid. It is usually in the form of cash.

The Act regulates brokers' handling of margins. Section 4d(2) of the Act, 7 U.S.C. § 6d(2), mandates, *inter alia*, that FCMs treat and deal with all funds and property received by them to margin, guarantee or secure trades or contracts, or accruing as the result of trades or contracts, as the property of the customer. Customer funds and property within the meaning of § 4d(2) must be separately accounted for and may not be commingled with the FCM's own funds or used to margin the trades of or extend credit to any other person. However, this same section allows but does not require FCMs to invest these funds in certain (highly liquid) obligations.[2]

The regulations which correspond to § 4d(2) detail this basic framework. FCMs may invest in obligations specified in § 4d(2) (Regulation 1.25), they must segregate and separately account for such obligations (Regulation 1.26), and they must maintain detailed records concerning such investments (Regulation 1.27). Under Regulations 1.28 and 1.29, FCMs who invest customer funds in authorized obligations bear the risk of any decline in the value of such obligations and may retain any "increment" and "interest" received on such investments. Regulation 1.29 specifically states:

> The investment of customer funds and obligations described in section 1.25 shall not prevent the futures commission merchant or clearing organization so investing such funds from receiving and retaining as its own any increment or interest resulting therefrom.

17 C.F.R. § 1.29 (1985). It is this regulation which plaintiff claims flatly contradicts, and is, therefore, an erroneous application of § 4d(2)'s mandate that brokers will handle margins "as belonging to [the] customer."

## II.

Before analyzing plaintiff's arguments the court notes that it is unclear from his pleadings and briefs what exactly he thinks is illegal conduct. Craig's complaint seems to say that FCMs act illegally when they retain interest made on any margin money of the customers (count I, ¶ 24). However, in his memorandum in opposition to Refco's motion to dismiss the amended complaint, Craig claims a right only to the interest on the *surplus margin* which remains after the FCM has paid the margin required by the Exchange. Because no such distinction exists in the Act or its regulations, and plaintiff has given no reasonable basis for

---

called the 'initial' margin, implying—correctly—that additional deposits may become necessary. The need for additional margin is usually triggered by changes in the market price of the contract. Thus, for example, if the market price of the futures contract declines so that the buyer ... sustains a paper loss, that loss is deemed to erode the deposit that he originally made and a margin call for additional funds will be issued by his carrying broker (who acts as custodian of the deposit). Conversely, however, if the market price of the futures contract rises, so that the buyer has a paper profit, he may usually withdraw a equivalent amount of the deposit originally made since the unrealized profit will act is protection in its place. The seller ... is likewise subject to margin calls if a market price movement creates paper losses and he too may make withdrawals from his original deposit if unrealized profits accrue." P.M. Johnson, Commodities Regulation § 1.21 at 31–32 (1982).

**2.** Section 4d(2) of the Act provides:
  (2) Such person (FCM) shall, whether a member or non-member of a contract market,

treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as a result of such trades or contracts, as belonging to such customer. Such money, securities, and property shall be separately accounted for and shall not be commingled with the funds of such commission merchant or be used to margin or guarantee the trades or contracts, or to secure or exchange the credit, of any customer or person other than the one for whom the same are held: *provided further* ... That such money may be invested in obligations of the United States, in general obligations of any State or of any political subdivision thereof, and in obligations fully guaranteed as to principal and interest by the United States, such investments may be in accordance with such rules and regulations and subject to such conditions as the Commission may prescribe.

splitting up the margin into different categories and treating each sum differently, the court refuses to accept plaintiff's distinction. Plaintiff's arguments will be discussed in terms of all the funds received by an FCM from the customer, including the initial margin and any adjustments made to it due to profits or losses.

■ Plaintiff's basic argument is that by enacting Regulation 1.29 the Commodity Futures Trading Commission (CFTC) [3] erroneously interpreted the Act, contradicting its mandate that FCMs treat margin as belonging to the customer. His argument is one of congressional intent. Only when such intent cannot be divined from legislative history or congressional actions (using traditional tools of statutory construction) is it necessary to construct Congress' intent indirectly by analyzing administrative interpretations of the statute. *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

For his argument, plaintiff Craig cites various supporting rules of statutory construction in his initial brief, including the "plain language rule," the rule that "no clause, sentence or word should be rendered void or contradictory," and the rule that "a statute is to be given reasonable construction." Unfortunately, Craig does not address the legislative history of the Act, which clearly authorizes the practice described in Regulation 1.29 and which no amount of statutory construction can deny.

In 1936 Congress was concerned with FCMs' practice of using customer margin funds to satisfy their own debts or to extend credit to other customers. As Senator Pope said:

> [Margin deposits] have been intermingled with the funds of these [futures commission] merchants, and have been used by them in the conduct of their own business. They have not been held intact for the benefit of the traders. It further appears that certain favored dealers have not been required actually to put up the money for margins and have been extended credit in that respect. This gives these favored dealers an advantage. In some instances large commission firms have become bankrupt and the funds placed with them by a large number of dealers were lost.

80 Cong.Rec. 6162 (1936).

The House solution was to prevent FCMs from using margin money at all for any purpose. 79 Cong.Rec. 8587 (1935). The Senate felt that this was too harsh:

> A third question has been raised as to the proviso in subsection 2 of section 4(d) ... which refers to moneys deposited with commission merchants for margins. It is provided in the bill that these moneys must be deposited by the commission merchant with a bank or trust company or clearing house organization. It is pointed out that such commission merchants ought to have the right to invest this money in good securities. This seems a valid criticism of the bill.
>
> The grain futures administration believes that such investments may properly be made but should be limited to investment securities of national banks, as defined in and under authority of section 5136 of the revised statutes of the United States, as amended.... It would rule out questionable paper in which many State banks are now permitted to invest their capital....

80 Cong.Rec. 6612–13 (1936) (remarks of Senator Pope). The Senate adopted the agency's suggestions and § 4d(2) was amended. The amendment was to "provide some limitation under which the commission men may use [customer funds] to invest" while rectifying "the evils which have heretofore existed in relation to the investment of money coming from clients...." 80 Cong.Rec. 7911 (1936) (remarks of Senator Norris).

---

**3.** Prior to the CFTC, established in 1975, the Act was administered by the Commodity Exchange Authority of the United States Department of Agriculture. Both agencies promulgate regulations under the Act.

The senators' language and purpose directly supports Regulation 1.29, when read with Regulations 1.25 through 1.28. Congress wanted to ensure that customers' margin funds did not disappear. Regulations 1.25 ensures this by requiring FCMs to maintain at all times funds equivalent to the present market value of the margin deposited by the customer. Because of this requirement the FCM must compensate for any decline in the value of an obligation purchased with customer funds by adding his own funds to the segregated account. Hence the FCM, not the customer, bears the risk of any decline in the value of investments purchased with customer funds. Conversely, Regulation 1.29 recognizes that FCMs may retain the profits received on such investments. Plaintiff argues that this scheme fails because

> if the FCM purchases Treasury bills with the customer's margin deposits the FCM receives interest earned, but if the customer, instead of depositing cash, purchases T-bills himself (and uses those as his margin deposit), he receives the interest earned.

(Plaintiff's answering memorandum in opposition to defendants' and *amici* memorandum in support of a motion to dismiss, p. 2).

Plaintiff misses a key point in his argument: the customer who gives an FCM a T-bill as margin, instead of cash, may gain from the T-bill, but he or she is also bearing the risk of a decrease in the instrument's value. The Act's scheme, framed in its regulations, is simply a codification of the basic proposition that he or she who bears the risk should also receive the benefit from such risk. By its language Congress clearly intended to incorporate this proposition into § 4d of the Act. The Act restricts investment to "safe" securities, but even those are subject to fluctuation in value due to changes in interest rates. If the FCM bore the risk of loss but had no opportunity to gain there would be no reason to invest at all and the authority to invest would, as a practical matter, be meaningless. Congress permitted investment for a limited gain if the FCM accepted the possibility of a limited loss.

Further support of Regulation 1.29 can be found in Congress' actions since the Act was passed. Since then Congress has comprehensively reviewed the federal regulatory framework governing commodities futures trading on at least four occasions. *See* Pub.L. 90–258, 82 Stat. 26 (1968); Commodities Futures Trading Commission Act of 1974, Pub.L. 93–463, 88 Stat. 1389 (1974); Futures Trading Act of 1978, Pub.L. 95–405, 92 Stat. 865 (1978); Futures Trading Act of 1982, Pub.L. 97–444, 96 Stat. 2294 (1983). Not once did Congress disturb Regulation 1.29, even though the 1968 and the 1974 legislation included amendments to § 4d(2). Although the section was scrutinized, Regulation 1.29 was left intact. From these actions the court can infer congressional approval of the regulation and the statutory construction it codifies. *North Haven Board of Education v. Bell*, 456 U.S. 512, 535, 102 S.Ct. 1912, 1925, 72 L.Ed.2d 299 (1982). *See also Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 382, 102 S.Ct. 1825, 1841, 72 L.Ed.2d 182 (1982); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1973). The inference is particularly appropriate here because in enacting the 1974 amendments Congress expressly mandated that

> [a]ll rules, regulations and orders heretofore issued by the ... [CFTC] under the [Commodity Exchange Act] to the extent not inconsistent with provisions of this Act, shall continue in force and effect unless and until terminated, modified or suspended by the [CFTC].

Pub.L. 93–463, 93d Cong.2d Sess. § 411, 88 Stat. 1389 (1974).

■ This court holds that Congress intended to allow FCMs to keep interest or other profit made from investing margin monies in obligations specified by the Act.

Even if congressional intent was not as clear as we think it is, Regulation 1.29 is legal as a reasonable administrative interpretation of congressional intent. *Chevron*, 104 S.Ct. at 2782 (reasonable interpre-

tation is correct standard); *see also Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Itel Corp. v. U.S. R.R. Retirement Bd.,* 710 F.2d 1243, 1244–45 (7th Cir.1983). Further where, as here, Congress expressly delegates rule-making authority to the agency, the agency's regulations are given "controlling weight." *Chevron,* 104 S.Ct. at 2782; *see also Production Tool v. Employment and Training Administration,* 688 F.2d 1161, 1165 (7th Cir.1982). As a final blow to plaintiff's attack, Regulation 1.29—written only one year after passage of the original Act—has

> peculiar weight as a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; making the parts work efficiently and smoothly while they are yet untried and new.

*Norwegian Nitrogen Products Co. v. U.S.,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1927). *See also Miller v. Youakim,* 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979) (administrative interpretations are especially persuasive where, as here, the agency participated in developing the provision). Thus, legal standards for the review of administrative interpretation all point to the legality of Regulation 1.29.

Because we find that defendants are entitled to interest and profit from investing plaintiff's margin funds, we find plaintiff's claim that he is entitled to such funds under § 4d(2) of the Act insufficient to state a claim upon which relief can be granted.[4] *Marchese v. Shearson, Hayden, Stone, Inc.,* C.V. 78–4298–WMB, (C.D.Calif., June 27, 1985). *See also Crabtree Investments, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 577 F.Supp. 1466 (M.D.La.1984).

### III.

Plaintiff's other claim is based upon the Racketeer Influenced and Corrupt Orga-

nizations Act (RICO). But that claim is dependent upon illegal conduct under § 4d(2) of the Act, and there is none. Accordingly, we dismiss the RICO count as well.

### *Conclusion*

Plaintiff's claims under the Commodity Exchange Act and the RICO Act are dismissed for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

**4.** Defendants also argue that plaintiff agreed to allow defendants to keep the money in question when he contracted with defendants for their services. Plaintiff argues that the contract terms are void as against public policy. Because we find that defendants can legally keep the money, we also find the contract provisions valid.